v. Mary Garland, U.S. Attorney. Good morning, Your Honor, and may it please the Court, my name is Brian Casey. I'm here on behalf of Petitioner Mariana Ndudzi. Mariana Ndudzi's petition for review raises three independently sufficient reasons that compel reversal of the BIA's decision below. First, the unauthenticated, unverified notes from Ms. Ndudzi's credible fear interview are not reliable, both as a matter of law and a matter of fact. They should not have been relied on by the BIA or the immigration judge before as a basis for her adverse credibility determination. Second, as this Court has stated clearly in several recent cases, claims for relief under the Convention Against Torture must be separately addressed. In particular, the corroborating evidence must be addressed. Here, they were not, and therefore remand is required. Third, when reviewing an IJ's decision, the BIA must actually review the totality of the circumstances. In Ms. Ndudzi's case, no reasonable fact finder would conclude under the totality of the circumstances that she was not credible, particularly when coupled with her extensive corroborating evidence from multiple experts, her partner, and the extensive country conditions evidence that was submitted. I'd like to briefly review the facts and then address each of these issues. Ms. Ndudzi was brutally beaten and raped by members of Angola's government security forces in front of her children after participating in a peaceful protest against the Angolan government. Even the BIA credited that. The government's brief even acknowledged that the IJ credited her a description of her rape and beating, and they qualified as torture. She fled with her partner and their three children to Uruguay. Then, when they were threatened in Uruguay, she fled to the port of entry in Laredo, Texas, and sought asylum. She was in Uganda province, and then she went to Uruguay. She went to a Spanish-speaking country, and she came to the States. She said that she spoke Portuguese, French, and Spanish. French is by far her best language. It was preferable to her. There are two quite distinct Portuguese dialects. Yes, there are, Your Honor. As a matter of fact, that was something that the Portuguese translator noticed at the very beginning of the merits hearing. That's one of the things that troubles me about these cases, the perception of what's being interpreted through these interpreters and what's understood and not. That was one of the things that concerned me, so for the benefit that may be to you. We entirely agree, Your Honor. The translation problems that were rife in the credible theory review are a substantial portion of what we believe are the problems with the question and answer portion of the credible theory notes. As I was saying, when she got to her first merits interview, she was only provided a Portuguese interpreter at the credible theory interview, and so she tried to respond in Portuguese. When she got to the first merits hearing, she was given a Portuguese interpreter again, and the interpreter immediately said, I can't understand her. We've got translation problems. She might be from Angola. She was from Angola. They speak a different dialect of Portuguese in Angola than they do in Brazil or in Portuguese. That is part of the problem of relying in any way on the credible theory. The other little note here to me is that Spanish and Portuguese are far from interchangeable. There's a lot of supposition. I know Texans kind of think that if you talk a little Spanish, you can speak Portuguese, and it ain't so. It ain't so, Your Honor. They're very, very different. They are, as anyone from Portugal or Brazil or even Angola would tell you. So when she arrived at the Board of Entry, she was separated from her children. At her credible theory interview, she was found to be credible and have a credible fear of persecution. The documents that were created as part of that interview are an important part of the issues on appeal. The summary of the notes in the interview is completely consistent with her hearing testimony and all the other evidence. The IJ and the BIA, however, focus on the question-and-answer portion of those notes, which are not transcribed, which are not verbatim, which were not read to her, which materially conflict with the summary, and which were all part of the interview that took place in Portuguese, which is not her best language. Okay? It's the perceived inconsistencies between the question-and-answer and her hearing testimony which form the primary basis for the BIA's affirmance of the IJ's adverse credibility determination. So in reaching that decision, the adverse credibility determination, the BIA ignored and failed to examine all the corroborating evidence that Ms. Ndidi put forth. So I guess I'd like to focus first on the CFI interview notes. They aren't reliable in this instance as a matter of law or fact. When you take a look at the documents, okay, there's two documents that are created when you have a credible fear interview. First, there's the worksheet, and then second is these notes. And the notes are actually divided into two parts, and they're in the record 626 to 632, somewhere in that ballpark. And what you see is only certain portions of the interview is ever read to her. Okay? And the documents themselves demonstrate what, as best we can tell, what portion of the notes are read to her. It's supposed to be the stuff that's in italics. Okay? None of the things that gave rise to the inconsistency are in italics. None of them are – that's purely the question and answer portion. And the summary is – she's perfectly – she's satisfied perfectly consistently with the summary. That is the portion of the document that's supposed to be read to her. So there's no inconsistency between what was read to her and her subsequent hearing testimony and her asylum application. And the documents themselves say, we're not a transcript. Okay? This is not verbatim. There are portions that may be left out. The documents are created for a particular purpose, which is just to determine whether or not she has a credible fear. It's not to, like, create a basis for cross-examination later. As a matter of fact, the Border Patrol agents are generally not instructed to give a terribly long examination. And so there are a whole bunch of reasons why the notes themselves, particularly the question and answer portion, are not reliable. And a number of courts have said so. Just to be clear, your argument is not that there weren't inconsistencies. Your argument is that there are inconsistencies, but it's because the notes are unauthenticated, unreliable. Well, what I'm saying is there isn't any competent evidence that there are inconsistencies. Okay? Because the only thing that anyone has ever looked at to say there are inconsistencies are the question and answer portions of the notes, which were not verbatim, which were not read back to her, which were written that were not intended for this purpose, and were in a language that was not her best language. That's what we're saying. So if you look at the only portion of the documents that may have been read to her, there aren't inconsistencies. But then when you look at it more holistically, given the totality of the circumstances, there still isn't credible evidence that she was ever read that so that she had a chance to correct it or that that was able to even say that that's what was said or not. So a number of courts, but most importantly the BIA in their own precedential decisions, have said that there are certain criteria that need to be met in order for credible fear interview notes to be deemed to be reliable. And that's the INRI SS case, the INRI MS case. And the BIA didn't even follow its own precedential decisions because in those cases it says, you know, if you have questions written out and answers written out and they're read back and they're signed by the applicant, that could be reliable. If you have an electronic recording and transcription, that could be reliable. Or if you have a summary, that summary could be reliable. But none of that is what's going on here. And so what we're saying is as a matter of fact and a matter of law, consistent with a lot of other circuits, we should find that in this particular case the credible fear interview notes, particularly the question and answer portion, which form the basis for the adverse credibility determination, were not sufficiently reliable to be relied on as a basis for the adverse credibility determination. So we cite a number of the cases from other circuits that are entirely consistent with that, including INRI Questus Rojas from the First Circuit. That's the most kind of recent and most fulsome kind of explanation of that analysis. So once you take away that, there isn't anything under the totality of the circumstances that there isn't a basis for – no reasonable fact finder would have found her to be incredible. It is the examination based on those question and answers that really form the basis of it. And what the statute says, what 1158B says, is that you have to consider this under the totality of the circumstances. You have to consider all the relevant factors. And we would submit that that simply didn't happen. What I'd like to also do, I'd be happy to talk about the particular circumstances, the particular factors that the BIA relied on if you'd like, but I also want to make sure that I talk about the lack of examination of the corroborating evidence as well as the Catt claim. Because even if there is an adverse credibility determination, you still have to look at the corroborating evidence when you're making your decision with respect to asylum and withholding or removal. And in this case, the court didn't. They made the adverse credibility determination and stopped. And here there was a substantial amount, a huge amount of corroborating evidence. There was everything from her partner's declaration that what she said happened is exactly what happened, substantial country condition evidence, and then not one but two experts that talked about the situation in Cabinda and what would likely happen to her upon her return. And none of that was addressed by the BIA. And it's important also to remember that what we're focusing on is the BIA's decision. The BIA issued its own opinion, and therefore that's the decision that we're supposed to be looking at. Shifting gears slightly to some more background facts, actually she got to Uruguay, as I understand it, she applied for asylum there. Yes. But then she abandoned that apparently because she said she had gotten threats from Uganda. Angola. Following that. Yes. What happened to her application? Do we know in the record what happened to her application for asylum? We don't know, and that's not in the record, Your Honor. My understanding is she left before that was ever adjudicated. But she left because they received threats from people in Angola, including an Angolan cell phone number, while she was in Uruguay after her partner went on television and talked about the situation in Cabinda. So to briefly touch on the CAT claim, the Convention Against Torture claim, the BIA also erred with respect to that. As this Court has said a number of times recently, including in Abu Shaghaf and Arul Nanthi, both of which came out fairly recently, a CAT order is distinct from a final order of removal and doesn't affect the validity of the final order of removal. It requires independent analysis, and failure to engage in that independent analysis requires remand. And this Court has said a number of times just in the last year that failure to do that required remand in those cases that I talked about. Rather than focus on the evidence that Ms. Ntutsi submitted, the BIA basically constructed an analysis that isn't part of the regulations. They said, well, there's no evidence that she was being actively looked for now. And that isn't the question under the regs. The regs are what would happen if she was removed to Angola. And what multiple experts in the evidence that we submitted said is when she gets off the plane, she's going to be met by government security forces, the exact people that raped her before, and asked why she has been out of the country for a couple years. She's going to return under this cloud of suspicion that she's a member of FLEC. And so what the government is doing with respect to her now has nothing to do with what's going to happen to her when she's handed on a silver platter to the people that have tortured her before. So we would say that that's not at all the relevant analysis. Secondly, the other analysis of whether it's more likely than not that she would be tortured upon her return, the principal evidence of that is evidence of past torture. And there's no doubt, even the BIA concluded that she was tortured in the past, and the government doesn't address why that is not sufficient evidence that she would be tortured in the future. I'd like to reserve the balance of my time. Thank you, Your Honor. May it please the Court, Stephanie Hennis for respondent. Your Honors, in this case, there's an important aspect of the credible fear interview notes that Petitioner's Counsel has been overlooking. And that's the fact that in immigration court, with the use of a French interpreter, Ms. Ntidzi attested to the accuracy of the parts of the credible fear interview that the agency is relying on here. So if you look at the record on appeal at 221, she testified to the accuracy of her statement about belonging to FLEC. What occurs in that portion of the transcript is DHS Counsel is questioning her and is reading from the credible fear interview notes. And he's positing, do you remember telling the asylum officer about your citizenship? And that answer is correct. Do you remember telling about your religion? Yes. She says, do you remember saying that your husband is the leader of a campaign? This is at 215 to 216. She says yes. She remembers being asked why men came to harm her. And she said, it was because I am part of a group that fights for independence. And then she's asked, do you remember being asked why they know you were part of the group? And she says yes. And she said that she told them because the government is aware of the people who belong to FLEC. So apart from all the other indicia in the CFI notes where there are questions about whether the petitioner understands the interpreter, the interpreter is asked about whether she understands the petitioner, that's asked at several parts of the interview. In addition to that, I'd like to address the Portuguese interpretation because at the beginning of the interview, the petitioner is asked, what language would you like to proceed in? And she says Portuguese. So because she said Portuguese, a Portuguese interpreter was used. It's true that her expert, Dr. Schubert, said that someone who is from Angola might have a difficult time understanding Brazilian Portuguese. But petitioner testified that the Portuguese speaker who was used during her interview spoke European Portuguese. That person spoke Portuguese from Portugal. I thought that the first interpreter really disqualified himself because he said he didn't understand her because she was speaking a different dialect of Portuguese. So that's what occurred at the first immigration court hearing. And it's true that immediately that interpreter said, we are having a difficult time understanding one another. But then that interpreter went on to say, I think she needs a European Portuguese speaker. That Portuguese interpreter at the immigration court hearing said, I think that the petitioner would need a European Portuguese interpreter, which is what the petitioner testified she had at her credible fear interview. So she had a European Portuguese speaker when she made the statements to the asylum officer about belonging to FLEC, which she then attested to the accuracy of when she was in immigration court using a French interpreter, which she later maintained that French was her best language. I will still point out that in her asylum application, she did indicate that she spoke Spanish, French, and Portuguese all fluently. But I wanted to ensure that the court understood that even with that translation or interpretation problem that's apparent on the record at the beginning of the immigration court hearing, that interpreter actually suggested the dialect of Portuguese as appropriate that was used during her credible fear interview. Another thing that supports this connection to FLEC, which another court has found to be a tier three terrorist organization, is that during her hearing testimony, the petitioner acknowledges that her husband worked for FLEC, that he was gathering the youth in the neighborhood in support of FLEC. So it's not as though the asylum officer introduced this concept of FLEC. Even in immigration court, she's continuing to acknowledge her family's involvement with this group, which also connects with a statement that she made during her credible fear interview when asked why she fears harm in the future. She says that she knows her husband is on the list for this group, and I belong to this group. She later tries to explain that by saying when she was talking about a group, she didn't mean FLEC. She meant the church, or she meant the population generally. The immigration judge and the board went through a long analysis of why it was rejecting that, pointing out that she never mentioned anything about the Catholic church apart from saying that that was her religion. But I should think that the Department's awareness of the actual conditions in those countries are not, would provide a very informative backdrop against which to gauge ambiguities and uncertainties in responding to those. In other words, I see these things, and the response is often that it's what those conditions in those countries are. There's extensive information about that. You know that there are or are not groups that are persecuting people, and that these things are, in fact, occurring or not occurring. There's no evidence of them. But I don't see any big discussion in here about what the actual conditions were in the Uruguay that are consistent with what her story is. In other words, the matrix against which you judge the credibility is over, tripped up in language difficulties and oral back and forth, and I understand that. But that seems to be the sole focus, and I wonder what, if someone comes from a country where this is prevalent and these activities are going on, and her testimony is consistent with that, that ought to count for her, too. But I don't hear that. What I hear is that she's interviewing different people, and they're hearing, the people, the hearing examiners are hearing one after the other after the other, et cetera, and they're making a judgment call about whether she's lying or not. Credible fear. Well, so the credible, the asylum officer who conducted the credible fear interview found her credible. It was in immigration court where she wanted to- I understand that. She started to- Somebody that goes back and says something contrary. I don't know how you- Well, and again, she affirmed the accuracy of the statements that she made to the- We've had one case where the IJ had heard 304 petitions, and it had died 302 of them. Pardon me, but I get somewhat skeptical about that range of quality of interview. You may not be familiar with that case. We are. It's been adjudicated through here. So I tell you that just more widely, that the process itself, it's very difficult to travel. It's not your difficulty, and I know it's difficult for the government too, but that's the problem I have in saying, well, you said this. You said you were a member of the- Well, no. No, you're not, et cetera. Maybe that's the only thing you've got to go on, but those seem like minor inconsistencies in the recollections of stories. So it's not- So when considering an adverse credibility determination- I'm sorry. I'm having a little trouble hearing your voice. I'm sorry. Is this better? That's better. When considering- These acoustics every year seem to go away. I apologize, Your Honor. I'll confess I'm having a little bit of a difficult time hearing you as well. When considering an adverse credibility determination, when making an adverse credibility determination, the agency is allowed to look at any material factor. And so even though it does appear that the petitioner told a generally consistent account, although there is an inconsistency in whether it was the police or the military who came to her home. And that is an inconsistency that actually arises between her asylum application, which she prepared with counsel, and then what she testified to in immigration court. So that is separate from the credible fear interview. It also- While her husband did submit a declaration talking about the harm she had experienced, he wasn't there when it occurred. So I would- He wouldn't be able to support whether- independently support who exactly it was, whether it was someone in a- whether it was people in a military uniform, or whether it was someone wearing a police uniform that said police across the chest. There are also- What about counsel's assertion that there was really no evidence in the record that there was any consideration given to other corroborating evidence? For example, evidence of country conditions. So there was consideration of country conditions in this case. There's two pages that the immigration judge wrote that addressed the country conditions evidence in Angola, which was then adopted by the board. The other thing to keep in mind here is that the connection to Fleck is important for asylum and withholding because it would present a mandatory bar to receiving the relief that she was requesting. If she provided material support to Fleck as a terrorist organization or was a member of Fleck, then she wouldn't have been able to get asylum or withholding. So even if she tells a generally consistent story about the harm that she experienced, unless she- the fact that she connects herself to a terrorist organization is relevant to her eligibility for relief because it is a- it's a bar to obtaining asylum or withholding of removal. I wanted to also get at the issue of what decisions the court can address here. In our brief, we cite a case- a recent case from this court that- Vector v. Barr that says that the court can review not just portions of the immigration judge's decision that are expressly adopted, but where the IJ's decision influences the decision of the board. And it's clear in this case that the immigration judge's decision influences the board. In addition to adopting all of the factual findings, including findings about country conditions, the board, in most of its sentences, is citing specifically to portions of the immigration judge's analysis. So it is appropriate to look at the more detailed analysis that the immigration judge offered about the country conditions evidence and the basis for the adverse credibility determination. So let me address the convention against torture claim a bit. First of all, the government does not concede in our brief that the immigration judge expressly found that the account of rape was credible. We present that as an alternative finding that the immigration judge made because the first portion of the IJ's decision talks about how her claim of being raped is inextricable from her torture claim. But after that, the immigration judge said, but to the extent that this did in fact happen to her, the immigration judge acknowledges that that would constitute torture, but then gives reasons why the likelihood of future torture is not at the more likely than not level. So the immigration judge acknowledges that the expert, Dr. Schubert, says that she'll be— Counsel, let me ask you, if I could, to talk a little bit about the decision of the First Circuit that Cuesta-Royals v. Garland case in 2021. The opposition relies in points to that. How would you distinguish that case? It's certainly not binding on us, but it's out there. The solemn officer interviewed and asked the applicant to confirm the accuracy of a summary of the testimony. The First Circuit said these discrepancies were derived from notes and asked him to confirm the summary. It sounds on its face like very much the pattern of what we have here. So what do you say about that case? In that case, the First Circuit was examining whether there was an inconsistency in the first place, and the court said that the petitioner in that case had answered the questions that were asked and wasn't— and then just elaborated on the statements that were made during the immigration court hearing. So the court concluded that there wasn't actually an inconsistency. The person was just responding to the questions that were asked, and it left open the ability to further elaborate on it. However, in this case, we have the petitioner directly connecting herself and her partner with Flex. And so it's not as though— it's not as though she started talking about one aspect of her claim and then there wasn't any questioning about other aspects, and so there wasn't a discussion of it. Here, there were follow-up questions about why she was targeted and why she feared harm, and she herself connected Flex to that harm and said that she belonged to the group and said that her family belonged to the group and that it's something that you pass along. And again, then in immigration court, she connected her partner to it. So I would distinguish in that— if somebody says, I'm a Republican, I'm a Democrat, those are pretty elusive concepts sometimes, but is that what we're talking about, a membership in some formal sense or subscribing to the values of a particular movement? As you step away from some sort of formality of membership, you get into simply a gradation of viewpoints. I mean, I think here the relevant issue is that she said she belonged to the group. She didn't say that she generally believed in the same things that Flex believed in during her credible fear interview. She said that she actually belonged to that— she said that she belonged to that group. That's a nonverbatim summary, though, the thing you keep referring to. Yes, that she also attested to the accuracy of during her immigration court hearing. So that is the distinction there, Your Honor. I thought she said that everyone's viewpoint was— I thought Lee's language was more descriptive of a viewpoint that was being persecuted, that was identifiable by the label Flex, and that therein lies some uncertainty. So were you a member of it or not? Can you help me with that? Well, I mean, I guess I would also say if the court sees some uncertainty in here, this is still—this is substantial evidence review. So even if the court thinks that another reasonable fact-finder could view this evidence differently— I know you're backing away a little bit from it. You mean there's some other evidence that makes it substantial or something other than this carries the day? Or what about this point? You relied upon it. Well, right, and I'm saying that this is— it was reasonable and the evidence, when you consider that she attested to the accuracy of the statement in immigration court, she said that she's fluent in Portuguese. Another Portuguese interpreter said that she needed a European Portuguese interpreter, who is the—that is the interpreter that she had. So when she said she was fluent in Portuguese, obviously everybody didn't agree that she was. Not in Brazilian Portuguese. Wonderful. She said Portuguese. I guess nobody asked her at that point to be specific. And when you tell me about this nonverbatim summary, there's a line where she says—because this is a summary. The summary says she said, because the government is aware of the people that belong to FLEC. It's like generations of family, and even when they die, they pass it along. So if my granddaddy was a member of FLEC, I'm automatically a member because that's my grandfather. It's passed along. That's what she said, yes, Your Honor. I don't know personally how FLEC goes about determining membership. But that is what she said, and she never contested saying that. We know that can't be accurate, don't we? I don't know. What we know is what's in the record, and what the record says is that. So what you want to do is adopt everything that's in this nonverbatim summary because she said it, and then you say she attested to it. So now everything she said in here is true. Well, Your Honor, if she didn't— And when she said, I'm not a member of FLEC, that's not true. Well, if she wanted to distance herself from the statements that she made during the credible fear interview, she could have done that, but she didn't. She said that she said them. She admitted to it. And I realize I'm out of time, but would I be able to bring up one final point that gets at the issue that you're addressing? Absolutely. So I would also say that in terms of the two board cases that the petitioner cites, matter of AS and matter of MS, that get at the reliability of DHS interviews, those are pre-real ID cases, and what the agency utilized here was matter of JCHF, which assesses the accuracy based on the totality of the circumstances. So I'm pointing out that the totality of the circumstances includes her saying in immigration court that she did, in fact, make those statements to the asylum officer. Thank you, Your Honors. Thank you. Mr. Breshear. Yes. A couple of points, if I may, Your Honors. Getting back most recently to... Well, I guess I'd like to set the stage. The counsel for the government spent a lot of time talking about what the IJ said. As we've talked about, the BIA issued its own opinion. When the BIA issues its own opinion and doesn't simply adopt the IJ's opinion, it's the BIA's decision that's before the court. And you're only able to judge and affirm the BIA's opinion. That's Chenery, that's Accardi, that's Gotra. So she spent a lot of time talking about stuff that's not the basis of the BIA's opinion. Then, if I may, Your Honor, she talks about Ms. Ndudze attesting to the accuracy of what was in the credible fear interview. I guess I'd just like to read from page 221 of the record. And you answered, it's the rebel group that fights for the independence of the committed. You need to slow down and keep your voice up. Sorry. One of my colleagues said, once you're talking faster than I can think. Well, I apologize. You answered, it's the rebel group that fights for the independence of the committed. Do you remember answering that? No. No. That's on page 221. Okay, so ma'am, under oath, are you now denying that you are a member of FLECT? I sincerely, I am telling you, I am sincerely telling you, I am not a member of FLECT. I'm not a member of FLECT. However, in the town where I live, the government labeled people easily as FLECT members as they please. She didn't adopt that, okay, by any stretch of the imagination. She agreed with some portions of it. And, Your Honor, I'd like to kind of clarify, what you were reading from  You were not reading from the summary of the notes. In the summary portion of the notes, there is no mention whatsoever of FLECT, okay? She talks about supporting the independence of Cabinda. Half of Cabinda supports the independence of Cabinda. So that is important to both understand what she did, in fact, testify to in the merits hearing, and then also distinguish between the question and answer portion, which there is no indication that it was ever read to her, in the summary. And the summary, like I said, does not mention FLECT once. Okay? With respect to the Portuguese, she was given a Portuguese interpreter, and then asked, what language would you like to proceed in? And so she said, Portuguese. It wasn't like she was given a smorgasbord of options. She was given a Portuguese interpreter, and so that's what she went with in the credible fear interview. And what she says repeatedly is that her husband belongs to, or supports the group that supports the independence of Cabinda. She doesn't even say that he belongs to FLECT. The government talks briefly about the inconsistency between whether she testifies that she was brutally raped and beaten by members of the military, or members of the government, members of the police. I would submit, Your Honor, that that's not simply true, but that's kind of crazy. No one disputes that she was beaten and raped by three members of the government security forces, whether they had police on their back or they looked like army folk is entirely trivial. But even more importantly, that's not something that was raised in the hearing. That's something that came up for the very first time in the IJ's written decision. And so she would have been able to explain that, you know, honestly, nobody differentiates between the military and the police in Cabinda. And certainly none of that detracts from the accuracy of what in fact happened to her. And then there was extensive discussion about whether or not she belonged to FLECT, in addition to saying that she didn't. That isn't the basis for the IJ's decision. As a matter of fact... Sorry, isn't the basis for the BIA's decision. As a matter of fact, the BIA specifically disavows that in the BIA's opinion, and therefore that isn't a basis for... It's really kind of off-topic. In your honors, I see I'm out of time, so thank you very much, unless you have any further questions. Thank you. Thank you.